**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4600-17T2

HALA MORCOS and MARY
MORCOS,

     Plaintiffs,

v.

OTTO SCERBO, SCHWARTZ
and SCERBO, HOOGSTRA,
SCHWARTZ and SCERBO,

     Defendants.

_____

PATRICIA A. IBRAIMI,

     Plaintiff,

v.

OTTO J. SCERBO, ESQ.,

     Defendant.

_____

TRUSTEES OF THE NEW JERSEY
LAWYERS' FUND FOR CLIENT
PROTECTION,

Plaintiff-Appellant,

v.

OTTO J. SCERBO, JOHN SCHWARTZ,
and SCHWARTZ & SCERBO, PC,

Defendants,

and

PNC BANK, N.A.,

Defendant-Respondent.

_____

JOHN R. SCHWARTZ, and
SCHWARTZ & SCERBO, PC,

Plaintiffs,

v.

IRONSHORE INDEMNITY, INC.,
JLT FACILITIES INC., and
UNDERWRITERS AT LLOYDS,
LONDON,

Defendants.

_____

Submitted February 26, 2019 – Decided April 4, 2019

Before Judges Yannotti and Natali.

On appeal from Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-1229-16.

Michael T. McCormick, attorney for appellant New Jersey Lawyers' Fund for Client Protection.

Brown & Connery, LLP, attorneys for respondent PNC Bank, NA (Jeffrey R. Johnson, on the brief).

PER CURIAM

The Trustees of the New Jersey Lawyers' Fund for Client Protection (Fund) appeal from an April 13, 2018 order denying its motion for summary judgment, granting summary judgment to defendant PNC Bank, N.A., (PNC), and dismissing with prejudice the Fund's claims that PNC was strictly liable under section 3-420 of New Jersey's Uniform Commercial Code (UCC) for depositing checks bearing forged endorsements. After thoroughly reviewing the record in light of the arguments raised on appeal, we affirm in part, vacate in part, and remand for proceedings consistent with our opinion.

I.

The Fund is a Committee of the Supreme Court of New Jersey established pursuant to Rule 1:28-1(a) to reimburse "losses caused by the dishonest conduct of members of the bar of this State." The Fund paid five claims, totaling $298,263.23, related to the dishonest conduct of disbarred lawyer, Otto J. Scerbo. The three claims at issue in this appeal relate to Scerbo's alleged forgery of his clients', Jonathan Vazquez, Joseph and Carmella Ricci, and Patricia A.

Ibraimi, endorsements on checks that PNC received and deposited as a depositary bank.

After the Fund paid Vazquez, the Riccis, and Ibraimi $178,228.29 and they assigned and subrogated their claims to it, the Fund filed a complaint against Scerbo, John Schwartz, their law firm (Schwartz & Scerbo), and PNC. Counts fifteen, twenty-four, and thirty-three of the complaint alleged that PNC unlawfully converted checks payable to Vazquez in the amount of $42,318.29 (Vazquez claim), Ibraimi in the amount of $15,000 (Ibraimi claim), and the Riccis in the amount of $133,515 (Ricci claim).[1] We address the Ibraimi, Ricci, and Vazquez claims separately.

## II.

A. <u>Ibraimi Claim</u>

Ibraimi retained Schwartz & Scerbo in a personal injury action related to a slip-and-fall at a Costco store. An arbitrator recommended a $30,000 settlement. Costco would not agree to resolve the case for that amount, so Scerbo filed a notice of demand for trial de novo.

According to Scerbo, during a phone call between him and Ibraimi, Ibraimi "very reluctantly" agreed to settle the case for $15,000. Scerbo

---

[1] The court consolidated the Fund's complaint with matters not on appeal.

thereafter received a letter from Costco's counsel, which enclosed a copy of a stipulation of dismissal and a release form.

Scerbo testified that after he confirmed Costco's settlement offer, Ibraimi refused to accept the settlement funds. Scerbo acknowledged that despite Ibraimi's position, either he or his secretary, who was a notary public, "forged" Ibraimi's signature on the claim release, endorsed Ibraimi's name on the settlement check, and then presented the check to PNC for deposit in his trust account. PNC accepted and deposited the check in Scerbo's account.

Ibraimi filed an initial and supplemental statement of claim with the Fund in which she claimed Scerbo "forged" her signature on the $15,000 settlement check "and stole [her] money." Ibraimi signed a release, assignment, and subrogation agreement with the Fund on February 27, 2015. According to the Fund, on March 11, 2016, it employed a messenger to file its complaint with the court, "a distance of two city blocks" away from the Fund's office, "with the reasonable expectation" that it be delivered that day or the next business day. However, the complaint was not filed until March 15, 2016.

B. Vazquez Claim

Vazquez also retained Scerbo to represent him in a personal injury case, which Scerbo settled in December 2013. Scerbo testified that he settled the case

A-4600-17T2

"with [Vazquez's] consent" for $75,000.  According to the Fund, "Scerbo forged Vazquez's endorsement to the $42,318.29 check, one of three checks issued by the tortfeasor's insurer to settle the matter."  The record contains a check dated December 9, 2013, in the amount of $42,318.29, payable to the order of Jonathan "Vasquez,"[2] with a payee address of Otto J. Scerbo at Schwartz & Scerbo's office in Jersey City, New Jersey.  Scerbo testified at deposition that although he had authority to receive, endorse, and negotiate the check, he did not remember whether he, in fact, endorsed the check.  Nonetheless, Scerbo conceded that he deposited the check in his trust account at PNC, but "did not disburse [Vazquez's] portion of the funds to him" and "did not pay him back."

Vazquez filed a statement of claim with the Fund on October 15, 2014.  In a supplemental statement, he denied that he or "anyone on [his] behalf authorized [Scerbo] to write checks to himself or sign [his] name on checks on [his] behalf."  Similarly, Vazquez certified in an October 31, 2014 forged endorsement affidavit that "[t]o the best of [his] knowledge and belief, [he] never authorized anyone to sign [his] name on [the settlement] check."  Vazquez signed a release, assignment, and subrogation agreement with the Fund on May 29, 2015, and the Fund paid Vazquez $42,318.29.

---

[2]  Above the payee line, the check states that the claimant is Jonathan Vazquez.

C. Ricci Claim

Joseph and Carmella Ricci retained Scerbo's firm to represent them in two real estate transactions, a June 2007 sale and a sale that closed in September 2013, though certain payments were made months after the closing. Only the September 2013 sale is relevant to this appeal. The Fund maintains that Scerbo ultimately received three checks totaling $135,308 as proceeds from the sale, forged the Riccis' endorsements, and presented them to PNC, which took and deposited the checks into Scerbo's trust account. Scerbo later reimbursed the Riccis for approximately $15,000, and the Fund paid the Riccis $120,910 as a result of Scerbo's actions.

During discovery, PNC produced a Power of Attorney dated September 24, 2013, signed by the Riccis, notarized by Scerbo's secretary, and which granted Scerbo the authority to "endorse . . . in my name . . . all checks . . . as my attorney-in-fact may deem necessary or appropriate . . . ." In addition, the Power of Attorney grants Scerbo the power to conduct "banking transactions" on behalf of the Riccis, as set forth in N.J.S.A. 46:2B-10 to -19.

The Riccis filed a statement of claim and a supplemental statement of claim with the Fund on November 20, 2014. In their supplemental statement, the Riccis denied that they "authorize[d] [Scerbo] to write checks to himself or

sign [their] name on checks." In addition, they stated that on September 26, 2014, Scerbo called and asked them "to sign an Affidavit to the effect that we gave our authorization to him to represent us in matters. We refused to do this and did not give him authorization for anything." Further in an April 6, 2015 forged endorsement affidavit, Mrs. Ricci certified that "[t]o the best of [her] knowledge and belief, [she] never authorized anyone to sign [her] name on" any of the checks that Scerbo endorsed in her name, and that she never saw or had them in her possession. Mr. Ricci provided an identical statement in his forged endorsement affidavit.

### III.

The Fund filed its complaint on March 15, 2016. Following discovery, the parties filed cross-motions for summary judgment with respect to the Vazquez, Ibraimi, and Ricci claims. PNC maintained the Ibraimi claim was barred as a matter of law under the UCC's three-year statutes of limitation. With respect to the Vazquez and Ricci claims, PNC argued it was undisputed that Scerbo had "authority to endorse" the checks and therefore it was not liable under N.J.S.A. 12A:3-420(a). Conversely, the Fund maintained PNC was strictly liable under that provision on all three claims for taking and depositing checks bearing forged endorsements.

A-4600-17T2

On April 20, 2018, after the parties waived oral arguments, the court granted PNC's motion and denied the Fund's cross-motion. In an oral opinion, the court held:

> Now, as to the Ibra[]imi matter, there is no credible argument made by the Fund as to why, other than its perceived lack of prejudice, . . . the claim was not filed within the strict three-year statute of limitations.
>
> As noted by PNC, the Fund's argument to salvage this claim was that it unquestionably filed its complaint outside of the statute of limitations, is only based on a single unpublished opinion.
>
> It is not based on any of the UCC provisions or on any interpretive case law. Similarly, under a UCC there is a strict three-year statute of limitations, and therefore filing outside of that time period, the claim would be time barred. That is N.J.S.A. 12A:3-118(g).
>
> . . . .
>
> As to the Va[z]quez matter, according to Mr. Scerbo's own testimony, he had the authority to endorse the Va[z]quez settlement check into his attorney trust account. This would have been customary since it was handled properly at its inception.
>
> . . . .
>
> [A]s to the power of attorney that was endorsed and negotiated with the specific authorization, the Fund does not counter the allegations nor the representations of fact surrounding the existence of a power of attorney that was given to Otto Scerbo from Mr. and Mrs. Ricci and appropriately notarized. Only unsubstantiated

9

arguments are made in favor or in support of the allegations, therefore summary judgment sought by the Fund as against PNC in this issue is denied, and summary judgment sought by PNC Bank as to this issue will be granted.

This appeal followed.

## IV.

On appeal, the Fund maintains: 1) it was entitled to summary judgment with respect to the Vazquez claim; 2) a material issue of fact precluded summary judgment in PNC's favor as to the Ricci claim; and 3) the motion judge incorrectly interpreted the law in barring recovery on the Ibraimi claim. In addition, PNC contends the Fund would impermissibly obtain "double recovery" if PNC were required to reimburse the Fund for conversion of the checks.

We review summary judgment rulings de novo, under the same standard governing the motion judge's initial decision. Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). If there are no genuine and material factual

A-4600-17T2

questions, we determine whether the court correctly interpreted the law. Walker v. Alt. Chrysler Plymouth, 216 N.J. Super. 255, 258 (App. Div. 1987).

Reviewing a summary judgment record involves an "evaluation, analysis and sifting of evidential materials," but "not the same kind of weighing that a factfinder (judge or jury) engages in when assessing the preponderance or credibility of evidence." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995). "On a motion for summary judgment the court must grant all the favorable inferences to the non-movant." Ibid.

A. Ibraimi Claim

With respect to the Ibraimi claim, the Fund maintains the court committed reversible error in requiring strict compliance with the UCC's applicable three-year statute of limitations, and argues the statute should have been relaxed under Negron v. Llarena, 156 N.J. 296 (1998). We disagree.

"[A]n action for conversion of an instrument . . . must be commenced within three years after the cause of action accrues." N.J.S.A. 12A:3-118(g). "An action involving a negotiable instrument accrues at the time the check is negotiated; that is, the statute of limitations begins to run at the time the check amount is debited from the maker's account." Psak, Graziano, Piasecki & Whitelaw v. Fleet Nat. Bank, 390 N.J. Super. 199, 204 (App. Div. 2007)

11

(citations omitted); see also N.J.S.A. 12A:3-104(b), (e), and (f) (defining checks as negotiable instruments). Thus, the cause of action for the Ibraimi claim accrued on March 12, 2013, when Scerbo presented, and PNC deposited, the $15,000 settlement check. As March 12, 2016, was a Saturday, the three-year statute of limitations expired on Monday, March 14, 2016. See Mercer Cty. Park Comm'n v, DiTullio, 139 N.J. Super. 36 (App. Div. 1976); R. 1:3-1; see also N.J.S.A. 36:1-1 (designating Saturdays as public holidays). It is undisputed that the Fund filed its complaint on Tuesday, March 15, 2016, one day after the statute of limitations had run.

The Fund maintains that we should apply the substantial compliance doctrine to relax the UCC's statute of limitation. The substantial compliance doctrine requires a party seeking to invoke that equitable doctrine to establish:

(1)    the lack of prejudice to the defending party;

(2)    a series of steps taken to comply with the statute involved;

(3)    a general compliance with the purpose of the statute;

(4)    a reasonable notice of petitioner's claim[;] and

(5)    a reasonable explanation why there was not a strict compliance with the statute.

A-4600-17T2

[Negron, 156 N.J. at 305 (quoting Bernstein v. Bd. of Trustees of Teachers' Pension & Annuity Fund, 151 N.J. Super. 71, 76-77 (App. Div. 1977)).]

In Negron, a wrongful death suit, the Court distinguished "[p]rocedural statute of limitations," which "govern general causes of action, such as torts and contracts," from "substantive statutes of limitations," which "restrict statutory causes of action that did not exist at common law." Id. at 300 (citations omitted). After noting that "substantive statutes of limitations are traditionally strictly applied," id. at 300-01, the Court recognized its "approach to substantive statutes of limitations has evolved to one that recognizes that their application depends on statutory interpretation focusing on legislative intent and purpose." Id. at 304.

Here, as explained in N.J.S.A. 12A:1-103(a), the legislative intent and policies underlying the UCC are:

> (1) to simplify, clarify, and modernize the law governing commercial transactions;
>
> (2) to permit the continued expansion of commercial practices through custom, usage, and agreement of the parties; and
>
> (3) to make uniform the law among the various jurisdictions.

Requiring strict compliance with N.J.S.A. 12A:3-118(g)'s three-year statute of limitation would promote simplicity, uniformity, and certainty in commercial transactions. Further, although there are no reported cases in New Jersey addressing whether the substantial compliance doctrine should be applied to relax N.J.S.A. 12A:3-118(g), we have declined to apply a related equitable doctrine, the discovery rule, to toll the statute. See Psak, 390 N.J. Super. at 207 (explaining "an unsuspecting victim of forgery is bound by the strict application of the UCC's three-year limitations period"); N.J. Lawyers' Fund for Client Prot. v. Pace, 374 N.J. Super. 57, 66-67 (App. Div. 2005). In addition, other states similarly require strict compliance with the UCC's statutes of limitations. See Pace, 374 N.J. Super. at 65 n.7 (listing cases from other jurisdictions in which the discovery rule was held inapplicable to the UCC's statutes of limitations); accord Jorgensen Farms, Inc. v. Country Pride Corp., Inc., 824 N.W.2d 410, 419 (S.D. 2012); Fuscellaro v. Indus. Nat. Corp., 368 A.2d 1227, 1231 (R.I. 1977); Estate of Hollywood v. First Nat. Bank of Palmerton, 859 A.2d 472, 481 (Pa. Super. Ct. 2004). We therefore conclude that strict compliance, not substantial compliance, with N.J.S.A. 12A:3-118(g) "would effectuate" the UCC's underlying policies, see Negron, 156 N.J. at 304, and that because the Fund

A-4600-17T2

failed to file its complaint within three years, the court correctly granted summary judgment to PNC on the Ibraimi claim.

B.  Vazquez and Ricci Claims

Turning to the Vazquez and Ricci claims, the parties agree that N.J.S.A. 12A:3-420(a) governs whether PNC improperly converted the checks.  That statute provides, in pertinent part, that an instrument is "converted if . . . a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment."  N.J.S.A. 12A:3-420(a).

The Fund maintains it was entitled to summary judgment on the Vazquez claim because depositary banks are "strictly liable" under the statute for "accepting, and warranting as authentic, endorsements forged by [an] attorney-thief," and no factual dispute exists that Scerbo endorsed the check in Vazquez's name and that endorsement was a "deliberate, willful, forgery . . . ."

By contrast, PNC maintains "[t]he Fund cannot shift liability to PNC Bank" under section 3-420 "unless [the Fund] demonstrates Scerbo was not entitled to endorse the check and deposit [it] into his attorney trust account" (emphasis added), and no material factual issue exists that "Scerbo had authority to endorse the check and deposit it into his attorney trust account."  The parties make essentially the same arguments as to the Ricci claim.

Thus, both before the motion judge and on appeal, the only issues the parties raise as to PNC's potential liability are: 1) whether Scerbo had authority to endorse the checks in his clients' names; and, if not, 2) whether a depositary bank is strictly liable under section 3-420 for taking for deposit a check bearing an unauthorized or forged endorsement.[3] The motion judge found the competent evidential materials in the record revealed no material factual issue that Scerbo was authorized to endorse the checks in his clients' names. We disagree.

"[A] depository bank is strictly liable for paying on forged indorsements" in an action for conversion under N.J.S.A. 12A:3-420(a). N.J. Lawyers' Fund For Client Prot. v. First Fid. Bank, N.A., 303 N.J. Super. 208, 223 (App. Div. 1997). In First Fidelity, the Lawyers' Fund "paid fifteen former clients of James V. Higgins, Esquire, . . . who had settled their tort claims without the clients' knowledge, forged the clients' signatures, and embezzled the clients' funds." Id.

---

[3] PNC has not articulated any argument that Scerbo was entitled to enforce the instrument or receive payment other than by virtue of his alleged authority to endorse the checks. We therefore express no views as to whether Scerbo may have been "entitled to enforce" the checks as "the holder of the instrument, a nonholder in possession of the instrument who has the rights of a holder, or a person not in possession of the instrument who is entitled to enforce the instrument pursuant to [N.J.S.A.] 12A:3-309 or subsection d. of [N.J.S.A.] 12A:3-418" in any way other than PNC's "authority to endorse" argument. See N.J.S.A. 12A:3-301 (defining "'[p]erson entitled to enforce' an instrument"). Nothing in this opinion should be interpreted as precluding the parties from addressing this issue, or any other matter, on remand.

at 211. Like Vazquez and the Riccis, the "clients assigned their rights to the Lawyers' Fund," which instituted an action for conversion "as assignee and subrogee" of the clients against the depositary bank. Ibid. We held that "if the claimants had pursued a legal action against" the depositary bank without assigning and subrogating their rights to the Fund, "they would have prevailed because there was no factual dispute that the checks were forged and [the bank] accepted and paid under the forged indorsements." Id. at 229. We therefore affirmed the Law Division's grant of summary judgment to the Fund because "the Lawyers' Fund has a right to subrogate against collateral sources other than the defrauding attorney." Ibid.

The difference between the case at bar and First Fidelity is the presence here of a factual dispute as to whether the checks were forged or unauthorized. See Kuhn v. Tumminelli, 366 N.J. Super. 431, 446 (App. Div. 2004) (stating the UCC "places responsibility for forged and unauthorized endorsements on depositary banks") (emphasis added); see also Leeds v. Chase Manhattan Bank, N.A., 331 N.J. Super. 416, 422 (App. Div. 2000) ("There is no substantial difference between an unauthorized endorsement and a forged endorsement, the result being the same in so far as concerns the passing of title." (quoting Teas v. Third Nat'l Bank & Trust Co., 125 N.J. Eq. 224, 227–28 (E. & A.1939)). Thus,

the critical issue raised on summary judgment was whether the competent evidential materials created a factual issue as to whether Scerbo was authorized to endorse the checks.

The motion judge found the only competent evidence in that regard was Scerbo's deposition testimony that he was authorized to endorse the checks, and concluded that PNC was entitled to judgment as a matter of law. Because the Riccis' and Vazquez's forged endorsement affidavits created material factual disputes regarding Scerbo's authority to endorse the checks, we disagree with the court's conclusion that PNC was entitled to summary judgment.

Both Joseph and Carmella Ricci and Vazquez submitted affidavits and supplemental statements disputing Scerbo's authorization. As to Vazquez, the court stated, "according to Mr. Scerbo's own testimony, he had the authority to endorse the Vazquez settlement check into his attorney trust account. This would have been customary since it was handled properly at its inception." In so concluding, the court credited Scerbo's sworn statement and failed to address that the summary judgment motion record contained Vazquez's affidavit directly contradicting Scerbo's deposition testimony. Accordingly, although we agree with the court that the Fund was not entitled to summary judgment on the

Vazquez claim, we disagree with its conclusion that PNC was entitled to summary judgment in light of that factual dispute.

The Riccis' claim is a bit more complicated. They too submitted affidavits attesting that Scerbo had no authority to endorse checks on their behalf. However, they also executed a Power of Attorney that expressly authorized Scerbo to "endorse . . . in my name . . . all checks . . . as my attorney-in-fact may deem necessary or appropriate," and which granted him the authority provided in N.J.S.A. 46:2B-10 to -19.

In its merits brief, the Fund describes the Power of Attorney as only "allegedly executed by the Riccis," maintains a "conflict" existed between "the Riccis' sworn statements and the [P]ower of [A]ttorney," and argues that it "should be afforded the opportunity to solicit testimony on this issue." The Fund further disputes the validity of the Power of Attorney in that, "[e]ven if the Riccis signed the [P]ower of [A]ttorney . . . , they may have been induced to do so by misrepresentations made by Scerbo as part of his plan to ultimately steal the check proceeds." The motion judge, other than stating "the Fund does not counter the allegations nor the representations of fact surrounding the existence" of the Power of Attorney and that the Fund offered "[o]nly unsubstantiated arguments" in support of its allegations, did not address that conflict.

The competent evidence that we must view in the light most favorable to the Fund on this issue consists of the Riccis' forged endorsement affidavits in which they dispute the validity of signatures on three checks made payable to "Joseph Ricci and Carmela Ricci." With respect to each check, the Riccis swore to the following statements: "The endorsement on the check, which purports to be my signature is not. In fact, the signature is a forgery. . . . To the best of my knowledge and belief, I never authorized anyone to sign my name on said check." In addition, Scerbo testified at his deposition that he began withdrawing money from his attorney trust account for his own personal use as early as "2010 or 2011," years in advance of the Power of Attorney dated September 24, 2013.

Accordingly, we are satisfied on this record that the existence of two competing statements, one authorizing Scerbo to endorse checks, and the other expressly stating that Scerbo had no such authority, created a genuine and material factual question sufficient to deny PNC's motion. However, on remand the Riccis must present further evidence, by way of affidavit or deposition, specifically addressing the authority purportedly given to Scerbo under the Power of Attorney. Nothing in our opinion forecloses additional summary judgment motions upon receipt of these sworn statements.

A-4600-17T2

PNC also claims that the Fund would impermissibly receive a "double recovery" if PNC was required to reimburse the Fund for the defrauded clients' losses. Although we agree that double recovery is not permitted, see County Concrete Corp. v. Smith, 317 N.J. Super. 50 (App. Div. 1998), PNC has failed to demonstrate that the Fund, in fact, would receive double recovery if PNC were ultimately found liable for conversion.

In County Concrete, the issue was whether a drawee bank "must reimburse a payee or the true owner of a converted instrument the full amount of that instrument even where the payee or true owner has otherwise received all or part of the monies that the instrument was intended to transfer." Id. at 61. We held that under those circumstances, the bank "is entitled to offset the amount of the monies actually received by the payee or true owner . . . ." Ibid.

However, County Concrete did not involve a payee who entered an assignment and subrogation agreement with the Fund. Rather, the payee sued in its own right after it already received a "replacement check" in the full amount of the first converted check. Id. at 52-53. Accordingly, our holding that the drawee bank against whom suit was brought was "entitled to offset the amount of the monies actually received by the payee or true owner," id. at 61, did not

21

assess a subrogee's rights to recover from a depositary bank after the subrogee makes payment to the subrogor. That issue is governed by First Fidelity.

By virtue of the assignment and subrogation agreements and its payments made to the defrauded clients, the Fund is an aggrieved party, and "[t]he remedies provided by the [UCC] shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed . . . ." N.J.S.A. 12A:1-305(a).[4] Therefore, although we agree with PNC that it may be entitled to an offset under County Concrete as the Fund may not receive a "double recovery," PNC's potential entitlement to an offset does not depend on the amount of money that the Fund paid to the defrauded clients. Rather, PNC's only plausible claim to an offset derives from the fact that the Fund has settled with another party for an undisclosed amount. Because that amount is undisclosed, we cannot determine the extent of any offset available to PNC. On remand, the trial court can address that issue in the first instance.

Finally, PNC contends that even if "Vazquez signed the check, it would have been deposited into the trust account," and that under County Concrete, a

---

[4] PNC has not disputed that the Fund is entitled to enforce the check by virtue of the subrogation agreements with Vazquez and the Riccis.

22

depositary bank is not subject to liability when the deposited funds reach their intended destination. This argument is meritless. There is no competent evidence in the record to conclude that, if Vazquez had endorsed the check, he would have deposited the check into Scerbo's trust account. Further, under County Concrete, it is not whether the funds reached their intended destination, but rather whether they reached the "intended payee" that determines the bank's liability, and there is no allegation that anyone other than Vazquez was the intended payee of the check. See County Concrete, 317 N.J. Super. at 61 (quoting Lund v. Chemical Bank, 797 F. Supp. 259, 272 (S.D.N.Y. 1992)).

Affirmed in part, vacated in part, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4600-17T2